JUDGE SWAIN 12 CV 2563

PREET BHARARA
United States Attorney
By:      LARA K. ESHKENAZI
         MARA E. TRAGER
         ELLEN M. LONDON
Assistant United States Attorneys
86 Chambers Street, 3rd Fl.
New York, NY 10007
Tel.: (212) 637-2758/2799/2737
Fax: (212) 637-2730
Email: lara.eshkenazi@usdoj.gov
       mara.trager@usdoj.gov
       ellen.london@usdoj.gov



UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------X

UNITED STATES OF AMERICA,                     :
                                              :
                    Plaintiff,                :
                                              :          12 Civ. ____
       v.                                     :
                                              :          COMPLAINT
DRAGADOS/JUDLAU, A JOINT VENTURE,             :
JUDLAU CONTRACTING, INC.,                     :
DRAGADOS USA, INC., and                       :          JURY TRIAL DEMANDED
                                              :
                    Defendants.               :
------------------------------------------------------------X

Plaintiff United States of America (the "United States" or the "Government"), by

its attorney, Preet Bharara, United States Attorney for the Southern District of New York,

alleges as follows:

## INTRODUCTION

1.      The United States files this civil complaint to recover damages and penalties from

defendants Judlau Contracting, Inc., Dragados USA, Inc., and Dragados/Judlau, JV (the "Joint

Venture") (collectively, "Defendants") under the False Claims Act and common law arising from

defendants' fraudulent scheme designed to avoid their obligation to hire disadvantaged business

enterprises ("DBEs") to perform work on a federally-funded project.  Rather than actually hire

DBEs for legitimate work, as required by United States Department of Transportation's ("DOT")

regulations designed to ensure the participation of DBEs in DOT-assisted contracts, Defendants

engaged in lies and subterfuge to make it appear that they had subcontracted work to DBEs,

while they had in fact arranged for the work to be performed by non-DBE subcontractors.

2.      As described more fully below, Defendants repeatedly and falsely represented that

they were paying millions of dollars to DBEs to perform work, even though they knew that the

work was in fact not performed by the DBEs and that the money it was paying was being passed

on to non-DBEs.

3.      As a result of the fraud, Defendants procured and continued to be engaged in a

contract worth millions of dollars.

## JURISDICTION AND VENUE

4.      This Court has jurisdiction over the claims brought under the False Claims Act

pursuant to 31 U.S.C. § 3730(a) and 28 U.S.C. § 1331, 1345, over the remaining claims pursuant

to 28 U.S.C. § 1345, and over all claims pursuant to the Court's general equitable jurisdiction.

5.      Venue lies in this District pursuant to 31 U.S.C. § 3732(a) and 28 U.S.C. §

1391(b), 1391(c), because defendants do business within this District.

## DEFENDANTS

6.      Plaintiff is the United States of America.

7.      Defendant Judlau Contracting, Inc. ("Judlau") is one of the largest construction

companies in New York, and is headquartered in New York City, with its principal offices

located at 26-15 Ulmer Street, College Point, New York 11354.

2

8.    Defendant Dragados USA, Inc. ("Dragados") is headquartered in New York City, with its principal offices located at 500 5th Avenue, 38th Floor, New York, New York 10110.

9.    Defendant Dragados/Judlau, JV is a joint venture between Dragados, its parent company Dragados S. A. and Judlau, formed pursuant to contractual agreement dated May 15, 2006, and is headquartered in New York City, with its prinicpal offices located at 29-85 Northern Blvd, Long Island City, New York 11101.

## REGULATORY AND FACTUAL BACKGROUND

### DOT DBE Regulations

10.    The DOT regulations entitled "Participation by Disadvantaged Business Enterprises in Department of Transportation Financial Assistance Programs," codified at 49 C.F.R., Part 26 (the "DBE Regulations") are designed to "ensure nondiscrimination in the award and administration of DOT-assisted contracts in the Department's highway, transit, and airport financial assistance programs."

11.    The DBE Regulations require that every contract that a DOT funding recipient signs with a contractor include an assurance by the contractor that "[t]he contractor . . . shall carry out applicable requirements of [the DBE Regulations] in the award and administration of DOT-assisted contracts," and that "[f]ailure to carry out these requirements is a material breach of this contract, which may result in the termination of this contract or such other remedy as the recipient deems appropriate." 49 C.F.R. § 26.13(b).

12.    DBE regulations provide that payments made to a DBE contractor may be counted toward DBE goals "only if the DBE is performing a commercially useful function on that contract." 49 C.F.R. § 26.55(c). A "commercially useful function" is performed when a DBE is

3

"responsible for the execution of the work of the contract and is carrying out its responsibilities by actually preforming, managing, and supervising the work involved." *Id.* To perform a "commercially useful function," the regulations require that the DBE "be responsible, with respect to materials and supplies used on the contract, for negotiating price, determining quality and quantity, ordering the material and installing (where applicable) and paying for the material itself." *Id.*

13.     The DBE regulations specifically prohibit "pass-through" arrangements. Thus, a DBE does not perform a commercially useful function "if its role is limited to that of an extra participant in a transaction, contract, or project through which funds are passed in order to obtain the appearance of DBE participation." *Id.* If a DBE does not perform or exercise responsibility for at least 30 percent of the total cost of its contract with its own work force, it is presumed that the DBE is not performing a commercially useful function. *Id.*

14.     With respect to DBEs under contract to procure supplies and material, the DBE regulations divide DBEs into three categories for purposes of calculating the allowable amount of DBE "credit" toward a contract goal:  manufacturers, "regular dealers" (a firm that owns, operates or maintains a store, warehouse or other facility to stock and sell the supplies required for the contract in the usual course of business), and brokers/expediters.  For manufacturers, the DBE regulations allow contractors to count 100 percent of expenditures for supplies and materials toward the DBE goal.  For regular dealers, contractors may count 60 percent of expenditures for supplies and materials.  And for DBE brokers/expediters, contractors may count only related fees and commissions toward the overall goal. *See* 49 C.F.R. § 26.55(e).

15.     The DBE regulations also contain specific provisions relevant to trucking

contracts. Pursuant to the regulations, a DBE trucking firm, "must be responsible for the management and supervision of the entire trucking operation for which it is responsible on a particular contract, and there cannot be a contrived arrangement for the purpose of meeting DBE goals." 49 C.F.R. § 26.55(d). Moreover, a contracted DBE trucking firm must "itself own and operate at least one fully licensed, insured and operational truck used on the contract" to receive DBE credit. *Id.* While the DBE regulations allow a DBE firm to lease trucks from non-DBE firms, in such a situation the only portion of the contract with the trucking DBE that may be counted toward the overall goal is the fee or commission received by the DBE for procuring the trucks from the non-DBE firm. *Id.*

### The East Side Access Contract

16.     The Metropolitan Transportation Authority ("MTA") oversees the construction of a tunnel connecting the Long Island Railroad to Grand Central Station (the "East Side Access Project"). The East Side Access Project is partially funded with "New Start" grant money from the Federal Transit Administration. Specifically, the DOT has funded approximately 42 percent of the total cost of the project.

17.     As a condition of receiving DOT funding, the MTA must establish DBE goals for particular construction projects and requires general contractors on those projects to make good faith efforts to reach DBE goals.

### The MTA's Bidding Process and the DBE Certification Requirements

18.     Before the bidding process for a federally-funded project commences, the MTA's Department of Diversity and Civil Rights establishes the DBE goal for the project. After the goal is set, the contract is advertised, and the MTA selects a bidder. The bid package submitted by

bidders must contain a schedule of DBE participation ("Form A") identifying all of the DBE sub-contractors the bidding prime contractors intend to use for the project. The Form A identifies the names of the DBEs, a description of the services they will perform, and the proposed start and end dates of their services. If selected, the prime contractors are required to submit monthly DBE progress reports ("Form Es") identifying the amount of money paid to the DBEs. The Form Es must be submitted for the contractors to be paid for requisitions they submit to the MTA.

### The Establishment of DBE Goals and the Award of the East Side Access Contract to the Joint Venture

19.    With respect to the East Side Access Project, the MTA set the DBE goal at 5 percent of the contract. The total value of the contract was estimated at approximately $447 million. Thus, unless MTA granted a waiver, the winning bidder was required to hire DBEs to perform at least $22 million worth of work.

20.    In June 2006, as part of its bid backage, the Joint Venture submitted a Form A (the "June 2006 Form A") listing four DBEs as subcontractors for the contract – Wang Engineering ("Wang"), Eaton Electric ("Eaton"), Redwood Contracting ("Redwood") and Environmental Energy Associates ("EEA"). The June 2006 Form A indicated that the total contract amount for the four DBEs would be more than $22 million. The Form A was signed by the President of Judlau on behalf of the Joint Venture. The Form A also provided: "as conditioned for being awarded the contract, [the bidder] will enter into a formal agreement with each of the DBE firms listed in this schedule . . . ."

21.    In July 2006, the MTA awarded contract CM-009 to the Joint Venture (the "East

Side Access Contract"). MTA awarded the East Side Access Contract with the understanding, based on the Joint Venture's representation in the Form A, that the Joint Venture would meet its DBE obligations. The award letter specifically states that the Joint Venture "must comply with the requirements for the MTA's DBE program as forth in the Contract."

## THE FRAUDULENT SCHEMES

22.     Once work on Contract CM-009 commenced, the Joint Venture was required to submit monthly requisitions detailing the expenses incurred. Submission of the monthly requisitions was a requirement for the Joint Venture to be paid by MTA.

23.     Between June 2006 and November 2008, the Joint Venture submitted twenty-eight monthly requisitions to the MTA for the East Side Access contract.

24.     Each monthly requisition contained a cerfication by the Joint Venture that "the payment requested, all as presented in this Application for payment, are correct and in full compliance with the terms of the Contract and all authorized modifications thereto."

25.     Pursuant to the East Side Access Contract, the Joint Venture is required to submit monthly reports ("Form Es") on progress towards meeting its DBE Participation Goal to both the MTA Office of Civil Rights and to the MTA Procurement Officer for the East Side Access Contract.

26.     Between June 2006 and November 2008, the Joint Venture submitted twenty-eight monthly requisitions to the MTA for the East Side Access Contract, each accompanied by a Form E. Each of the Form Es included the following certification: "By signing this form, the person individually and on behalf of the Contractor represents to the Authority that the information contained herein is truthful, accurate, complete and not misleading."

7

27.    Each of the twenty-eight Form Es were signed on behalf of the Joint Venture by the project manager of the Joint Venture.  One of the twenty eight Form Es, for the month of June 2008, was also signed by the deputy project manager of the Joint Venture.

28.    Each Form E contained the following 4 questions:

Did any of the DBE subcontractors rent/lease equipment from the prime contractor or an affiliate company during the report period?

Did any of the DBE subcontractors utilize employees or former employees of the prime contractor or an affiliate company during the reporting period?

Did any of the DBE subcontractors subcontract any portion of its work to a non-DBE during the report period?

Has the scope of work or the subcontract amount for any of the DBE subcontractors changed since the last report?

29.    On every Form E that the Joint Venture signed between June 2006 and November 2008, the Joint Venture circled "no" for its response to each of the above questions, with the exception of question three with respect to Redwood starting in June 2008.

30.    The Form Es also contained a section requiring a detail of payments made to date to DBE subcontractors.

31.    In November 2008, the Joint Venture submitted to the MTA a Form E indicating the following amounts paid to each DBE:

Eaton:  $5,821,166.80 payments to date out of a total subcontract amount of $11,000,000

EEA:  $3,191,217.90 payments to date out of a total subcontract amount of $4,395,901.10

Wang:  $3,822,286.34 payments to date out of a total subcontract amount of $5,550,000.00

8

<u>Redwood</u>:  $4,552,292.84 payments to date out of a total subcontract
amount of $4,247,700.00

32.    In sum, in November 2008, the Joint Venture claimed to have already paid more

than $17 million to DBEs out of the total goal of $22 million.

33.    The November 2008 cerification on the Form E, as well as all the twenty-seven

Form E certifications before it, were in fact false.  Three of the four DBEs indentified in the

above-referenced Form Es– Eaton, EEA and Redwood – all participated in variations of the type

of pass-through schemes specifically prohibited by the DBE regulations.

### *Eaton*

34.    The June 2006 Form A indicated that the Joint Venture contracted with Eaton, as

a second tier subcontractor to Five Star Electric, to furnish and install electrical equipment and

wiring at the East Side Access job site for $11 million.  In the Form A, the Joint Venture certified

to the MTA that the work would include "furnishing substation equipment and installing light,

power, conduit & wire (second tier sub to Five Star Electric)."

35.    In fact, at the time of the submission of the Form A, the Joint Venture never

intended for Eaton to furnish and install electrical equipment and wiring.  Instead, Five Star

Electric purchased electrical power directly from Con Edison, but received a 1.5 percent "markup

fee" for purchasing the electrical power from Con Edison "through" Eaton.  Eaton's services

were neither needed nor used and Eaton was involved in the transaction solely to allow the Joint

Venture to earn DBE credits.

### *Redwood*

36.    The June 2006 Form A indicated that the Joint Venture had contracted with

Redwood to provide muck removal services for $4,247,700.  In the Form A, the Joint Venture

certified to the MTA that the work included "all labor and material for trucking and disposing of

tunnel muck."

37.    In fact, at the time of the submission of the June 2006 Form A, the Joint Venture

knew that Redwood did not own any of the trucks necessary for the work and therefore, pursuant

to 49 C.F.R. § 26.55(d), could not claim DBE credits for most if not all of the payments to

Redwood.  The Joint Venture used Redwood as a pass-through by providing them with a one

percent fee for work that was subcontracted out to third parties, including New York Dirt

Contracting.

*EEA*

38.    The June 2006 Form A indicated that the Joint Venture had contracted with EEA

to provide various design work and to furnish equipment for a total of $600,000.  In the Form A,

the Joint Venture certified to the MTA that the work would include "ventilation design" and the

provision of "ventilation equipment & sewer discharge permits and dewatering design."  The

Joint Venture later increased the subcontract amount to $4,395,901, as indicated on the

November 2008 Form E.

39.    At the time of the submission of the June 2006 Form A, the Joint Venture did not

intend to use EEA for all of the work indentified on the Form A.  Instead, the Joint Venture used

EEA as a pass-through by providing EEA with a fee ranging from 3 percent to 10 percent in

order to claim full DBE credit for materials that were actually purchased and ordered by the Joint

Venture.  The Joint Venture solicited suppliers, negotiated prices, and secured contracts for

materials that were then processed for payment through EEA as a mere conduit.  Even though the

10

Joint Venture knew that EEA was neither a manufacturer nor a "regular dealer" as defined in the DBE regulations, the Joint Venture fraudulently counted 100 percent of the cost of the material they purchased "through" EEA towards the DBE goal for the East Side Access contract.

<u>Defendants' Knowledge of the Falsity of the Form Es Submitted</u>

40.    Defendants knew that the Form Es that they filed were false as indicated in emails and other documents.

41.    In an email dated August 31, 2007, the Executive Vice President of Dragados wrote to the deputy project manager of the Joint Venture that (as translated from Spanish) (emphasis in original):

> I **don't** have a problem with contracting via Redwood for the subject of **DBE** [sic] We have previously already done this type of operation [sic] What I need to review is:
>
> - 1. - DBE % requested in the Contract
> - 2. - DBE % contracted
> - 3. - List of the **FEE** that we have paid prior.
>
> All of this is urgently important, [sic] I am going to meet with [the President of Judlau] today.

42.    In response, on August 31, 2007, the Joint Venture project manager wrote in an email to the Executive Vice President of Dragados (as translated from Spanish):

| | |
|---|---|
| Wang Engineering: | Don't pay them a FEE because they do the work themselves. |
| Environment Energy: | Pay them a FEE of 10% for engineering work and for buying ventilation equipment and water tanks.  The FEE is $137,000 |
| Five Star: | Pay them a FEE of 1.5% in order to use Eaton |

|  | Electric to buy energy. The FEE will be about $75,000 |
|--|--|
| Redwood: | We will have to pay a FEE of 1% to contract with New York Dirt through them. The FEE will be about $100,000. |

43.     These emails reflect that the Joint Venture knew of, and actively orchestrated, the fraudulent DBE pass-through schemes.

The Joint Venture's Revised Form E

44.     On February 10, 2009, after an internal investigation, the Joint Venture submitted to the MTA a revised Form E for December 2008 indicating the following total payments to each DBE:

   Eaton:  $0 payments to date out of a total subcontract amount of $2,000,000

   EEA:  $262,491.42 payments to date out of a total subcontract amount of $4,395,901.10

   Wang:  $4,221,128.01 payments to date out of a total subcontract amount of $5,550,000.00

   Redwood:  $0 payments to date out of a total subcontract amount of $0.

45.     In sum, the December 2008 Form E reveals that the actual amounts paid to DBEs by the Joint Venture was in fact less than $5 million, far less than the $17 million that had been claimed on the November 2008 Form E.

**FIRST CLAIM**

**Violations of the False Claims Act: Presentation of False Claims**
**(31 U.S.C. § 3729(a)(1) (2006))**

46.     The United States incorporates by reference each of the preceding paragraphs as if fully set forth in this paragraph.

47.     The United States seeks relief against defendants under Section 3729(a)(1) (2006) of the False Claims Act, 31 U.S.C. § 3729(a)(1)(A).

48.     As set forth above, in connection with the foregoing schemes, defendants knowingly, or with reckless disregard for the truth, presented and/or caused to be presented false or fraudulent claims for payment to the MTA, a receipient of federal funds, and such funds were spent or used by the MTA on the Government's behalf and to advance a Government interest.

49.     By reason of these false claims, the United States has sustained damages in a substantial amount to be determined at trial, and is entitled to a civil penalty as requird by law for each violation.

## SECOND CLAIM

### Violations of the False Claims Act: Making or Using a False Record or Statement (31 U.S.C. § 3729(a)(1)(B))

50.     The United States incorporates by reference each of the preceding paragraphs as if fully set forth in this paragraph.

51.     The United States seeks relief against defendants under Section 3729(a)(1)(B) of the False Claims Act, 31 U.S.C. § 3729(a)(1)(B).

52.     As set forth above, in connection with the foregoing schemes, defendants knowingly, or in reckless disregard for the truth, made, used, and caused to made and used, false records and statements matieral to a false and fraudulent claim that was made to the MTA, a receipient of federal funds, and such funds were spent or used by the MTA on the Government's behalf and to advance a Government interest.

53.     By reason of these false claims, the United States has sustained damages in a

13

substantial amount to be determined at trial, and is entitled to a civil penalty as requird by law for each violation.

### THIRD CLAIM

**Violations of the False Claims Act: Conspiracy to Make or Use a False Record or Statement (31 U.S.C. § 3729(a)(3) (2006))**

54.     The United States incorporates by reference each of the preceding paragraphs as if fully set forth in this paragraph.

55.     The United States seeks relief against defendants under Section 3729(a)(3) (2006) of the False Claims Act, 31 U.S.C. § 3729(a)(1)(C).

56.     As set forth above, in connection with the foregoing schemes, defendants conspired with DBEs and others to commit a violation of Section 3729(a)(1) (2006) and Section 3729(a)(1)(B).

57.     By reason of these false claims, the United States has sustained damages in a substantial amount to be determined at trial, and is entitled to a civil penalty as required by law for each violation.

### FOURTH CLAIM

**Unjust Enrichment**

58.     The United States incorporates by reference each of the preceding paragraphs as if fully set forth in this paragraph.

59.     By reason of the payments to defendants, defendants were unjustly enriched. The circumstances of defendants' receipt of these payments are such that, in equity and good conscience, defendants should not retain these payments, the amount of which is to be

determined at trial.

## FIFTH CLAIM

### Common Law Fraud

60.     The United States incorporates by reference each of the preceding paragraphs as if fully set forth in this paragraph.

61.     Defendants made material misrepresentations of fact, with knowledge of, or in reckless disregard of, their truth, in connection with the claims for payment submitted by, or on behalf of, defendants to the United States.

62.     Defendants intended that the United States rely upon the accuracy of the false representations referenced above.

63.     The United States made substantial payments of money in justifiable reliance upon defendants' false representations.

64.     Defendants' actions caused the United States to be damaged in a substantial amount to be determined at trial.

## SIXTH CLAIM

### Payment Under Mistake of Fact

65.     The United States incorporates by reference each of the preceding paragraphs as if fully set forth in this paragraph.

66.     The United States seeks relief against Defendants to recover monies paid under mistake of fact.

67.     The Government disbursed funds based on statements submitted by defendants to MTA under the erroneous belief that defendants' statements that they were complying with DBE

15

requirements were true.

68.     Because of these payments and/or guarantees by mistake, defendants have received monies to which they are not entitled.

69.     By reason of the foregoing, the United States was damaged in a substantial amount to be determined at trial.

WHEREFORE, plaintiff, the United States, requests that judgment be entered in its favor and against defendants as follows:

(a)     On the First, Second and Third Claims for Relief (Violations of the False Claims Act, 31 U.S.C. § 3729(a)(1)), for treble the United States' damages, in an amount to be determined at trial, plus civil penalties for each false claim presented;

(b)     On the First, Second and Third Claims for Relief, an award of costs pursuant to 31 U.S.C. § 3729(a)(3);

(c)     On the Fourth, Fifth and Six Claims for Relief, in an amount to be determined at trial, together with costs and interest; and

(d)     awarding such further relief as is proper.

Dated: New York, New York
        April 4, 2012

PREET BHARARA
United States Attorney for the
Southern District of New York
Attorney for Plaintiff
United States of America

By:  *Lara Eshkenazi*

LARA K. ESHKENAZI
MARA E. TRAGER
ELLEN M. LONDON
Assistant United States Attorneys
86 Chambers Street
New York, New York  10007
Telephone:  (212) 637-2758/2799/2737
Facsimile:  (212) 637-2750
lara.eshkenazi@usdoj.gov
mara.trager@usdoj.gov
ellen.london@usdoj.gov

17